UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| | | |
|---|---|---|
| TATIA WHITEHEAD, | ) | |
| and ERIC WHITEHEAD, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 2:17-cv-153 |
| v. | ) | |
| | ) | Judge Collier |
| WASHINGTON COUNTY, | ) | |
| | ) | |
| *Defendant.* | ) | |

# **M E M O R A N D U M**

Before the Court is Defendant's motion for summary judgment. (Doc. 18.) Plaintiffs have responded (Doc. 29), Defendant has replied (Doc. 37), and Plaintiffs have filed a supplemental brief in opposition (Doc. 42). For the reasons set out below, the Court will **GRANT** Defendant's motion.

## I. **BACKGROUND**

On September 6, 2016, Plaintiff Eric Whitehead and his girlfriend, Anna Wynn, returned home from the grocery store to discover Plaintiff Eric Whitehead's father, Larry Whitehead ("Mr. Whitehead"), had been drinking. (Doc. 31.) Mr. Whitehead began "nit-picking" Plaintiff Eric Whitehead and accused him of stealing his alcohol. (*Id.*) The two began arguing and Plaintiff Eric Whitehead finally told his father "he should go ahead and die because he 'was a thorn in everybody's a--.'" (*Id.* at 2.) Plaintiff Eric Whitehead and his girlfriend then left the house, at which point Mr. Whitehead came outside carrying his one-shot shotgun and told him that if he wanted Mr. Whitehead dead, he should go ahead and kill him. (*Id.*) Plaintiff Eric Whitehead then walked down the street with his girlfriend and told her to call the police so they could get help obtaining their belongings and pets from the house. (*Id.*)

On the 911 call, Ms. Wynn explained that her father-in-law was drunk and walking around waving his shotgun saying something like, "if you want to kill me, go ahead and kill me." (Doc. 18-5, Ex. A.) In response to additional questions from the dispatcher, Ms. Wynn said Mr. Whitehead had been drinking and arguing with his son, and had accused his son of stealing his alcohol. (*Id.*) She said Mr. Whitehead then went upstairs and got his shotgun. (*Id.*)

At 6:42 p.m., the responding officers were informed by radio that the suspect's name was Larry Whitehead, he was last seen outside in the yard carrying a shotgun, and had been drinking. (Doc. 18-5, Ex. A.)

Deputy Tim Moore ("Deputy Moore") arrived at the scene at 6:44 p.m. and asked Plaintiff Eric Whitehead and his girlfriend where Mr. Whitehead was and if he still had the shotgun. (Doc. 18-1, Ex. A 1:04–17.) Plaintiff Eric Whitehead told Deputy Moore he had last seen Mr. Whitehead in the side yard. (*Id.*) Deputy Moore then surveyed the scene and radioed that he would wait to approach the house until other officers arrived as there was no way to safely approach alone. (*Id.*) Deputy Lonnie Ratliff ("Deputy Ratliff") arrived at 6:47 p.m. and joined Deputy Moore at the entrance to the driveway, followed by Deputy Jackie Moncier a few moments later. (Doc. 18-1, Ex. C.) Deputy Moore asked what Mr. Whitehead's name was and, together with Deputy Ratliff, shouted for Mr. Whitehead four times and announced they were with the sheriff's department once. (Doc. 18-1, Ex. A 3:56 "Hey Larry"; 3:59 "Hey Larry"; 4:07 "Larry"; 4:10–12 "This is Sheriff's office calling out, Larry"; 5:00 "Hey Larry.") Around 6:50 p.m., Deputy Ratliff and Deputy Moore moved up the driveway towards the residence, stopping behind two cars parked next to the residence. (Doc. 18-1, Ex. B 2:32–52.) Deputy Ratliff called Mr. Whitehead's name an additional four times. (Doc. 18-1, Ex. A 6:43 "Hey Larry"; 6:45 "Larry"; 6:49 "Hey Larry"; 7:13 "Hey Larry.")

Around 6:53 p.m., Deputy Moore radioed for additional units stating that Mr. Whitehead was not responding to commands and was possibly inside the residence with a shotgun. (Doc. 18-5, Ex. A.) While waiting for additional units, the officers called out Mr. Whitehead's name two more times. (Doc. 18-1, Ex. B. 6:05 "Hey Larry. Come here and talk to us a minute"; 6:08 "Hey Larry.") The officers also attempted to have someone call Mr. Whitehead's cellphone to make contact. (Doc. 18-1, Ex. B 7:18–46.) Around this time, Deputy Burton Ellis, the K-9 unit handler, arrived with his trained canine, Blackjack. (Doc. 18-1, Ex. C.)

As other officers arrived, Plaintiff Eric Whitehead advised several of them that his father had been drinking, he was seventy years old, was hard of hearing, and had not threatened to harm himself or others. (Doc 17.) Plaintiff Eric Whitehead also explained that he did not believe his father's shotgun was loaded. (*Id.*)

At about 6:55 p.m., Sergeant John Foister ("Sergeant Foister") arrived and joined Deputy Moore and Deputy Ratliff by the parked cars next to the residence. (Doc. 18-1, Ex. B 8:15.)

A few minutes later, Deputy Moore observed a figure bobbing in the vegetation in the side yard. (Doc. 18-1.) He saw what he initially believed was a broomstick and then quickly identified it as a shotgun in Mr. Whitehead's hand. (*Id.*) Deputy Moore shouted, "Whoa, whoa, whoa, whoa, whoa! Put it down! Put it down right now!" (Doc. 18-1, Ex. B 10:10–14.) Another officer yelled, "Put it down! Put it down right now!" (*Id.* 10:14–15.) Deputy Moore yelled again, "Put it down!" (*Id.* 10:16–17.)

The parties dispute what precisely happened next. Plaintiffs contend the officers opened fire immediately upon seeing Mr. Whitehead emerge from the overgrown side yard. (Doc. 17.) Defendant contends Mr. Whitehead pointed the shotgun in the officers' direction, prompting them to open fire. (Doc. 19.)

3

There is no dispute that after ordering Mr. Whitehead to put the weapon down, multiple shots were fired. (Doc. 18-1, Ex. B 10:18–21; Doc. 18-5, Ex. A 18:57:57.) A few seconds later an officer shouted "He's down." (Doc. 18-1, Ex. B 10:28.) Another officer shouted "Don't get up!" (Doc. 18-1, Ex. B 10:38.) The officers then approached Mr. Whitehead's body, and Deputy Moore removed the shotgun from his hand, placing it several feet away. (Doc. 18-1, Ex. B 11:20–24.) The officers checked for a pulse, but Mr. Whitehead did not have one.

Plaintiffs, Tatia Whitehead and Eric Whitehead, are Mr. Whitehead's children. (Doc. 17.) On November 5, 2017, Plaintiffs filed suit against Washington County, the Washington County Sheriff, and the Washington County officers involved in the shooting. (Doc. 1.) Plaintiffs have voluntarily dismissed their claims against the sheriff and named officers. (Docs. 16, 17.) Plaintiffs allege Washington County is liable for Mr. Whitehead's death because it acted with deliberate indifference by failing to adequately train its officers in violation of 42 U.S.C. § 1983 and is responsible for the negligence of its officers and damages caused by its officers under Tenn. Code Ann. §§ 29-20-205, 8-8-302, and 8-8-303. (Doc. 17.)

Before the Court now is Defendant's motion for summary judgment. (Doc. 18.) Defendant contends the undisputed facts establish that the Washington County officers' use of deadly force was objectively reasonable and appropriate. (*Id.*) Defendant argues these facts entitle it to summary judgment as no constitutional rights were violated to give rise to a § 1983 claim. (*Id.*) Even if the officers did not act reasonably, Defendant contends it does not have a policy or custom that caused any alleged violation and thus is not liable under 42 U.S.C. § 1983. (*Id.*) Defendant further asserts it cannot be held vicariously liable based upon alleged intentional torts under Tenn. Code Ann. § 8-8-302 because the use of deadly force was reasonable. (*Id.*) Finally, Defendant

states it retains its immunity under Tenn. Code Ann. § 29-20-205(2) inasmuch as Plaintiffs' claims arise out of "civil rights." (*Id.*)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

If the moving party meets its initial burden, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). A genuine issue for trial exists if there is "evidence on which the jury could reasonably find for the plaintiff." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotations omitted). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 248–49. The court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). If the court concludes, based on the record, that a fair-minded jury could not return

a verdict in favor of the non-movant, the court should grant summary judgment. *Anderson*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

### A. Plaintiffs' Claim Under 42 U.S.C. § 1983

A county may be held liable under 42 U.S.C. § 1983 "for constitutional violations arising from its failure to properly train its employees." *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6th Cir. 1992). The threshold question is whether a county employee violated an individual's constitutional rights. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be liable under § 1983.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Defendant contends Mr. Whitehead's constitutional rights were not violated because the officers' use of deadly force was objectively reasonable. (Doc. 18.) Plaintiffs argue the facts support a finding that the officers acted unreasonably and used excessive force because of the discrepancies in how Mr. Whitehead was carrying the shotgun and problems with how the officers handled the situation overall. (Doc. 42.)

Excessive force claims are governed by the objective reasonableness test under the Fourth Amendment. *Graham v. O'Connor*, 490 U.S. 386, 388 (1989). The test is designed to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations omitted).

Application of the objective reasonableness test depends heavily on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9). The court must evaluate the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). The court also must recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation." *See Graham*, 490 U.S. at 396–97. Deadly force, in particular, is "reasonable only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (quoting *Garner*, 471 U.S. at 7, 11). "Only in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.2d 689, 697 (6th Cir. 2005).

Ultimately, the totality of the circumstances must be considered to determine if a particular seizure was justified. *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007). The relevant circumstances include only the "split-second judgments made immediately before the officer used allegedly excessive force." *Id.* at 407 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)) (internal quotations omitted).

This segmented approach to evaluating the reasonableness of the seizure requires the Court to disregard events leading up to the seizure as the Court cannot "find a constitutional violation based on how [the officers] approached the crime scene." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017) (explaining further that "[w]e do not scrutinize whether it was reasonable for the officer 'to create the circumstances.'"); *Chappell*, 585 F.3d at 909 (affirming the district court's rejection of arguments regarding the officers' behavior in executing a search

7

warrant because "it is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the detectives' conduct in time segments leading up to the seizure"). As a result, Plaintiffs' arguments regarding the officers' actions leading up to Mr. Whitehead's shooting, such as their failure to obtain relevant information about Mr. Whitehead or failure to use their sirens in approaching the scene, cannot be considered.

Instead, the Court must analyze the facts in the moments immediately before the officers fired their weapons, construing all evidence in the light most favorable to Plaintiffs.

The following facts are not in dispute. At 6:42 p.m., officers responding to the Whitehead residence were informed, "This is going to be a Larry Whitehead. They're outside—He's outside in the yard. Caller saw a shotgun, he was carrying around. He's saying, 'If you want to kill me, come on and kill me.' He was arguing with his son, accusing the son of taking his alcohol." (Doc. 18-5, Ex. A 18:42:14 Radio). Deputy Moore and Deputy Ratliff called Mr. Whitehead's name repeatedly, from the street and in the driveway, but he did not respond. (Doc. 18-1, Ex. B.) Mr. Whitehead then emerged from the overgrown side yard carrying a shotgun and began walking toward Deputy Moore, Deputy Ratliff, and Sergeant Foister. (Doc. 30, Ex. 1; Doc. 18-1, Ex B.)

Deputy Moore yelled, "Whoa, whoa, whoa, whoa, whoa! Put it down!" and other officers yelled "Put it down right now!" (Doc. 18-1, Ex. B.)

The parties dispute what Mr. Whitehead did next. Plaintiffs contend the deputies' version of events are contradictory, and thus there is a genuine dispute as to whether they had probable cause to shoot Mr. Whitehead. (Doc. 42.)

Deputy Moore in his sworn affidavit explains he initially thought Mr. Whitehead was carrying a broomstick before realizing it was actually a shotgun. (Doc. 18-1.) Deputy Moore then raised his rifle and yelled multiple times to put the gun down. (*Id.*)

> Mr. Whitehead did not respond verbally but continued moving toward us and he was about 20 yards away. I observed him moving the long gun into [a] firing position and he began to sweep the long gun in our direction. At that point I was certain that I was about to be shot and I opened fire with my patrol rifle, shooting a number of rounds.

(*Id.*)

In Sergeant Foister's sworn affidavit, he explained,

> I heard Deputy Moore yelling and then saw Mr. Whitehead in the field about 25 yards away, holding a shotgun. Deputy Moore yelled at him several times to put it down, but Mr. Whitehead continued to hold the shotgun and walk towards us. The look on Mr. Whitehead's face was blank, almost like someone on bath salts. Mr. Whitehead was naked, and I saw that his left hand was holding the front of the shotgun and his right hand holding the gun in the area of the trigger. At that point, while someone was still yelling at him to drop the gun, Mr. Whitehead raised the muzzle of the shotgun and pointed it in my direction. I opened fire with my patrol rifle.

(Doc. 18-2.)

Deputy Ratliff, in his sworn affidavit, stated,

> I heard Deputy Moore and Sgt. Foister yelling and saw a shirtless man in the field with a long gun. They were yelling at him to put the gun down. The man (Larry Whitehead) continued moving toward us and pointed the gun at us. As I moved to

> my right to aim my rifle at the man, Deputy Moore and Sgt. Foister opened fire. I fired my weapon moments later.

(Doc. 18-3.)

Deputy Ellis, the K-9 unit handler, was positioned to the side of the property with his canine, Blackjack. (Doc. 29.) In his interview with the Tennessee Bureau of Investigation ("TBI"), Deputy Ellis explained he heard the officers shouting to get on the ground and drop the gun. (Doc. 30, Ex. 1.) Blackjack then rose and looked to the left, prompting Deputy Ellis to see Mr. Whitehead walking towards where Deputy Ellis believed the officers were located. (*Id.*) Deputy Ellis stated the shotgun was pointed up or back, but not aimed at the officers. (*Id.*) Deputy Ellis then looked down to see if Blackjack was "on target" and ready to be released when he heard the first shots fired. (*Id.*)

Construing the evidence in the light most favorable to Plaintiffs, there are slight discrepancies in the officers' statements regarding how Mr. Whitehead was holding the gun at the moment the officers began to fire their weapons. However, there is no disagreement among the three deputies who fired their weapons that Mr. Whitehead pointed his gun at them. (Doc. 18-1, "I observed him moving the long gun into [a] firing position . . . ."; Doc. 18-2, "Mr. Whitehead raised the muzzle of the shotgun and pointed it in my direction."; Doc. 18-3, "The man (Larry Whitehead) continued moving toward us and pointed the gun at us.")

Plaintiffs argue Deputy Ellis's statements that he never saw Mr. Whitehead point his gun at the officers places the issue of whether Mr. Whitehead pointed his gun at the officers in dispute. (Doc. 42.) Plaintiffs claim a reasonable jury could weigh Deputy Ellis's statements more heavily than the three deputies and find Mr. Whitehead never pointed his gun at them. (*Id.*) Defendant contends that Deputy Ellis did not see Mr. Whitehead point his gun at the officers because he was looking down at Blackjack when the action most likely occurred. (Doc.37.) At the summary

judgment stage, however, the Court must construe all evidence in the light most favorable to the plaintiff in determining if a reasonable jury could find for the plaintiff. *Anderson*, 477 U.S. at 251–52. The Court cannot weigh evidence or make credibility determinations. *Id.* at 249. As a result, the Court is unable to make a finding as to whether Mr. Whitehead pointed his gun at the officers.

Even assuming Mr. Whitehead did not point his gun at the officers, however, the totality of the circumstances supports a finding that the officers had probable cause to believe Mr. Whitehead posed a serious threat. Based on the radio dispatch, the officers knew (1) Mr. Whitehead had been drinking, (2) he had argued with his son and accused his son of stealing his alcohol, and (3) had last been seen waving around his shotgun asking for someone to kill him. (Doc. 18-5, Ex. A.)

The officers then personally observed Mr. Whitehead walking towards them with a shotgun. (Docs. 18-1, 18-2, 18-3.) Carrying a weapon, alone, is not sufficient to justify the use of deadly force, but rather is part of the Court's assessment of the totality of the circumstances. *See Thomas*, 854 F.3d at 366 (quoting from *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination.")). The officers ordered Mr. Whitehead to drop his weapon several times, but he continued walking towards them with the shotgun. (Doc. 18-1, Ex. B and Docs. 18-1, 18-2, 18-3.) Plaintiffs' contention that Mr. Whitehead likely could not hear the commands does not change whether the officers' actions were objectively reasonable. *See Chappell*, 585 F.3d at 912 (6th Cir. 2009) ("ultimately, of course, the objective reasonableness of the detectives' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit

of hindsight."); *Thomas*, 854 F.3d at 365 (6th Cir. 2017) ("The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately."). Thus, the undisputed facts demonstrate that the officers were confronted with an individual known to be intoxicated, carrying a shotgun, walking towards them, and ignoring commands to drop his weapon. Mr. Whitehead could have fired his shotgun "with little or no time for an officer to react." *See Thomas*, 854 F.3d at 366 (explaining the officer's decision to shoot were reasonable in part because at a distance of forty feet "a suspect could raise and fire a gun with little or no time for an officer to react.").

Even construing all evidence in Plaintiffs' favor, Mr. Whitehead was carrying a deadly weapon, walking towards the officers, and ignoring their commands to drop his weapon. While Mr. Whitehead was not attempting to flee, *Graham*'s other two factors, the severity of the crime and the risk to officers' safety, strongly support a finding of objective reasonableness. *See Graham*, 490 U.S. at 396. Mr. Whitehead was believed to be armed and intoxicated, a potentially dangerous situation from the start. That danger only increased when he appeared from the side yard and walked towards the officers with a shotgun. Mr. Whitehead posed an immediate threat to officer safety by carrying the deadly weapon, walking towards the officers with that weapon and refusing to drop it when ordered to by the officers. Thus, the Court finds Defendant has established there is no genuine dispute as to material fact that the officers had probable cause to believe Mr. Whitehead posed a serious danger to their safety. As a result, their conduct was objectively reasonable under the Fourth Amendment. *See Graham*, 490 U.S. at 396.

Plaintiffs contend there are genuine issues of material fact still in dispute, namely that the officers could have remained under the cover of the parked cars in the driveway or employed the K-9 unit present at the scene to avoid firing their weapons. The Court, however, must consider

12

the reasonableness of the seizure "from the perspective of a reasonable officer on the scene" and make "every effort to ignore the advantages of 'the 20/20 vision of hindsight.'" *Graham*, 490 U.S. at 396. While under certain circumstances a reasonable approach may be "to monitor the suspect, issue a warning, or take cover," *Thomas*, 854 F.3d at 366–67, police officers are not required to take such steps in order to act objectively reasonably simply because in hindsight it might have prevented a tragic result.

Here, the officers observed Mr. Whitehead emerging from the side yard carrying a shotgun. The officers ordered Mr. Whitehead to drop the gun, but he did not do so. Instead, Mr. Whitehead continued walking towards the officers. The officers had to make a decision quickly, knowing that at any moment Mr. Whitehead could have easily fired his weapon at them. This was not a situation where the officers had the "time and space available" to contemplate whether it would be safer to take cover or employ the K-9 unit. *See Thomas*, 854 F.3d at 366–67 (explaining that an officer had to react quickly as the armed individual was running towards him); *Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 483 (6th Cir. 2018) (affirming summary judgment in favor of police officers because the officers reasonably believed the suspect still had a firearm and "nothing prevented [him] from turning to fire upon the officers"). Thus, Plaintiffs arguments do not create a genuine issue of material fact because they rely on the "20/20 vision of hindsight." *See Graham*, 490 U.S. at 396.

Plaintiffs also point to the expert report of Mr. Melvin Brown as introducing material facts in dispute. (Doc. 42.) Mr. Brown's report claims the officers' lacked adequate training, which he asserts led to their decision not to take cover or employ the K-9 unit and resulted in Mr. Whitehead's death. By focusing on the decision not to take cover or employ the K-9 unit, however,

13

Mr. Brown relies on the same hindsight claims that the Court cannot fairly consider in evaluating the reasonableness of the seizure. *See Graham*, 490 U.S. at 396.

As a result, the Defendant has met its burden of demonstrating there are no genuine issues of material fact in dispute regarding the officers' seizure. Because the officers acted objectively reasonably, Mr. Whitehead's Fourth Amendment rights were not violated and a suit against the county cannot be maintained under 42 U.S.C. § 1983. Accordingly, Plaintiffs' claim against Defendant for deliberate indifference for failure to train is **DISMISSED**.

### B. Plaintiffs' State Law Claims

Plaintiffs' remaining claims arise under Tennessee Code Annotated §§ 8-8-302 and 29-20-205. Because Plaintiffs' federal claim under 42 U.S.C. § 1983 has been dismissed, the Court can only hear the state law claims through the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. A court may decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). The purpose of making pendant jurisdiction discretionary is to avoid "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

In determining whether to exercise jurisdiction over state law claims, a court "should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). A court may also consider whether

the plaintiff has engaged in any improper tactics, such as forum manipulation, that would counsel against dismissing the claims. *Id.* 625 F.3d at 952. "When all federal claims have been dismissed, the preferred disposition of state law claims is dismissal, or, where a case has come into federal court on removal, remand to state court." *Scola v. Publix Super Markets, Inc.*, 902 F. Supp. 2d 1083, 1098 (E.D. Tenn. 2012) (citing *Gamel*, 625 F.3d at 952).

Here, the Court has dismissed Plaintiffs' claim arising under federal law, meaning it has dismissed "all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367 (c)(3). Deciding the state law claims is unlikely to promote judicial economy, convenience, or fairness because the federal claim has been dismissed. Further, the federal claim was not dismissed by Plaintiffs in an effort to move the claim to state court. *See Gamel*, 625 F.3d at 952 (explaining forum manipulation, where the plaintiff attempts to move his claim from federal court to state court by dismissing all the federal claims, can weigh in favor of retaining supplemental jurisdiction). In addition, the statute of limitations on state law claims are tolled by a federal court filing, meaning a state court would be able to hear Plaintiffs' state law claims if they choose to re-file their state claims there. *See Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock."). The Court finds there is no compelling reason to exercise supplemental jurisdiction over the remaining state law claims, and thus will decline to do so. Accordingly, the Court concludes Plaintiffs' state law claims should be **DISMISSED WITHOUT PREJUDICE**.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be **GRANTED**.

**An appropriate order will enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**